UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
PHILIP BARRY,

                            Petitioner,

            -against-

UNITED STATES OF AMERICA,

                            Respondent.
-----------------------------------------------------X
DEARIE, District Judge.

**MEMORANDUM & ORDER**

14 CV 5898 (RJD)

Philip Barry was convicted, following a jury trial, of one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 33 counts of mail fraud, in violation of 18 U.S.C. § 1341. The charges arose out of a large-scale Ponzi scheme that Barry operated for more than three decades. His victims number in the hundreds and include many working families and the elderly. Their losses, often of life savings or entire retirement funds, exceed $24 million. Under the advisory Guidelines Barry faced a sentence of between 324 and 405 months incarceration; the Court imposed 240 months on each count, to run concurrently, and ordered restitution in the amount of $24,146,540.

Following affirmance of his conviction by the Second Circuit and the denial of certiorari by the Supreme Court, see United States v. Barry, 502 Fed. Appx. 85, 2012 WL 5476682 (2d Cir. Nov. 13, 2012), cert. denied, 134 S. Ct. 328 (Oct 7, 2013), Barry now moves, *pro se*, for federal habeas relief pursuant to 28 U.S.C. § 2255. He asserts that he was denied his constitutional right to the effective assistance of counsel at trial ("Ground One" in Barry's

petition) and at sentencing (Barry's "Ground Two").[1]  Barry's Ground One, however, actually

contains seventeen separate "branches," and Ground Two an additional six.  For analytical

purposes, this memorandum Court treats each of the twenty-three instances of ineffectiveness

separately.  As will be discussed, however, whether Barry's two "grounds" are assessed as two

claims with multiple branches or as twenty-three separate claims is immaterial, for neither a

single "claim" nor the collective force of all twenty-three warrants federal habeas relief.   In fact,

the allegations are largely of such a trifling, overfastidious nature that they tend to denigrate the

Sixth Amendment guarantee and federal writ they invoke.  Accordingly, as detailed below, the

application is denied and the motion is dismissed.

## BACKGROUND

Writing principally for the parties, the Court assumes familiarity with the trial record,

particularly in light of the parties' extensive submissions[2] and the Circuit's affirmance of Barry's

conviction and sentence.  As that appellate panel summarized:

> The jury was presented with overwhelming documentary evidence of the large-
> scale Ponzi scheme that Barry operated for more than 30 years. Seized records
> showed that over at least six years, $27 million in investors' funds were deposited
> into four different bank accounts controlled by Barry. The cumulative balance of
> those accounts, however, never exceeded $251,000, because the monies were not
> invested in stock options, as Barry represented on client statements. Rather, they
> were recycled to satisfy the return expectations of earlier investors and to pay
> Barry's own expenses.  Notes from Barry's files listed pretextual reasons why he
> could not send investors a list of the stocks in which he had purportedly invested.
> Several of Barry's investors testified about the various false assurances that he
> gave them over the years about their investments.  Meanwhile, the jury saw a

---

[1] Barry filed his papers on October 7, 2014, exactly one year after the Supreme Court's denial of certiorari, so his application is timely.

[2] Barry submitted a 73-page principal memorandum ("Barry Mem.") and a 56-page reply ("Barry Reply Mem.").  The government submitted a 50-page memorandum ("Gov. Mem."), along with sworn declarations from Lisa Hoyes, Esq. ("Hoyes Decl.") and Michael D. Weil, Esq. ("Weil Decl."), both of the Federal Defenders of New York, who represented Barry at trial and sentencing.

seized note on which Barry had written to himself, "I'm just a crook running a Ponzi scheme."

Barry, 502 Fed. Appx. at 87 (internal record citation omitted).

Additional factual particulars are discussed in the context of the ineffectiveness allegations to which they relate.

## DISCUSSION

## PART I: THE SEVENTEEN TRIAL CLAIMS

### A.    Dispositive Lack of Strickland Prejudice

On Barry's direct appeal, the Second Circuit found that there was "overwhelming evidence of Barry's guilt," 502 Fed. Appx. at 87, and thus "confidently conclude[d] that any evidentiary error was harmless." Id.  In this Court's view, these appellate determinations foreclose Barry's ability to establish that any of counsel's supposed trial errors caused him "prejudice" within the meaning of Strickland v. Washington, 466 U.S. 668, 688 (1984). Compare Barry, 502 Fed. Appx. at 87 (error is harmless if court "can conclude with fair assurance that the evidence did not substantially influence the jury") (internal quotation and citation omitted), with Strickland, 466 U.S. at 694 (prejudice requires "defendant [to] show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").  Notably, in the case of ten of Barry's trial-based ineffectiveness claims, the "harm" blamed on the alleged deficiency of counsel is essentially evidentiary;[3] for each, therefore, the Second Circuit's findings of overwhelming evidence and

---

[3] Ten of the seventeen claims (numbers 6, 7, 8, 9, 10, 11, 12, 13, 14, and 16) fall into this category.  As discussed in greater detail when examined under the Strickland deficiency prong *infra*, these claims complain about such matters as the scope of cross-examination, failures to object, and failure to introduce certain evidence.

harmless error necessarily dispose of the applicable <u>Strickland</u> prejudice inquiry. An additional

six of Barry's trial-based claims allege harm that, while not purely evidentiary, is sufficiently

evidentiary in nature that they are likewise disposed of on prejudice grounds by the same Circuit

findings.[4]

---

Although the Court has jumped into the merits by addressing <u>Strickland</u> prejudice, it is important
to note that this same feature of these 10 claims renders them procedurally barred from
consideration on § 2255. "It is well established that a § 2255 petition cannot be used to relitigate
questions which were raised and considered on direct appeal") (internal quotations and citations
omitted). <u>United States v. Pitcher</u>, 559 F.3d 120, 123 (2d Cir. 2009) <u>cert. denied</u>, 558 U.S. 1137
(2010). Likewise, section 2255 may not be used to challenge matters that could have been but
were not first raised on appeal. <u>See United States v. Frady</u>, 456 U.S.1 152, 164-65 (1982);
<u>Zhang v. United States</u>, 506 F.3d 162, 166 (2d Cir. 2007). Further, courts now recognize that the
repackaging of actual or putative appellate claims as ineffectiveness claims for purposes of
§2255 does not lift the procedural bar. <u>See, e.g., White v. United States</u>, 2012 WL 2119104, *5
(S.D.N.Y. June12, 2012) ("[section 2255] [p]etitioner unsuccessfully argued on direct appeal
that the jury instruction was incorrect and cannot now repackage that procedurally barred claim
as an ineffective assistance of counsel claim"); <u>Azzara v. United States</u>, 2011 WL5025010, at *6
(S.D.N.Y. Oct. 20, 2011) (section 2255 petitioner's "arguments . . . based on claims pursued on
direct appeal, repackaged . . . as ineffective assistance of counsel claims . . . are procedurally
barred").

The ten claims alleging evidentiary error as the consequence of the alleged deficiencies of
counsel are procedurally barred under these principles. Removing the ineffectiveness preface
and packaging to reveal the underlying claim exposes that three of the claims (numbers 7, 12,
and 16) were actually raised and rejected on appeal, that the other seven (numbers 6, 8, 9, 10, 11,
13 and 14) are the type of evidentiary or simple trial error that should have been raised on
appeal. All are therefore barred.

[4] Claim numbers 1, 2, 3, 4, 15, and 17 fall into this category. Claims 1, 2 and 3 fault counsel for
remarks in the opening statement and for failing to advance certain "theories of innocence"
(Barry's term), claim 15 challenges the quality of the summation, and claim 4 faults counsel for
failing to call defense witnesses. In light of the overwhelming evidence of his guilt, Barry cannot
show that, but for any of these alleged deficiencies, he would have been acquitted. Claim 17
faults counsel for not moving to dismiss the securities count at the close of the evidence, but
once again the Circuit's findings preclude any claim premised on the view that one of the counts
of conviction was not legally valid. Further, a challenge to the legal viability of the securities
count is a claim that should have been raised on appeal but was not; the claim is thus barred
under the principles outlined in note 3.

The only allegation left, which unlike the other 16 does not serve as a preface to an underlying
claim of trial error, is an attack on counsel's qualifications (claim number 5), which, as addressed

Lack of prejudice, in turn, entirely disposes of the seventeen trial-based ineffectiveness claims without the need to reach the question of deficient performance. See Strickland, 466 U.S. at 697 ("there is no reason for a court deciding an ineffective assistance claim . . . even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

**B.    *Strickland* Deficiency: Standard**

Nevertheless, because of the seriousness of Mr. Barry's crimes, the length of his sentence, the exorbitant length of the parties' submissions, and the parties' and Court's interest in bringing true closure to the matter, the Court will briefly show that, in any event, none of the allegations establishes deficient performance under prong one of Strickland.

To satisfy the deficiency prong of Strickland, Barry must show that counsel's performance "fell below an objective standard of reasonableness." 466 U.S. at 688. This "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Id. at 687. Because "it is all too easy for a court, examining counsel's [performance] after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable," id. at 689, the "[t]he reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." Kimmelman v. Morrison, 477 U.S. 365, 381 (1986). The reviewing court "must indulge a strong

---

*infra* at p. 14, is meritless. In any event, this claim, too, would fail on prejudice grounds in light of the overwhelming evidence of Barry's guilt

presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689. In short, "[t]he object of an ineffectiveness claim is not to grade counsel's performance," and "[c]ourts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." Id. at 697.

## C.    Deficiency Analysis

Barry's trial-based claims advance a brand of allegation that has no place in genuine Sixth Amendment or § 2255 legal discussion. The assertions are largely petty disputes over matters of trial strategy or proposed rewrites of small trial moments. They emanate not merely from the vantage point of hindsight but from Barry's particularly unrealistic, often perfectionistic wish-list. In short, Barry's con continues: as he is lacking neither in creativity, a facility with rhetoric, or salesmanship, it is no surprise that the arguments he suggests counsel might have advanced, the additional lines of questioning he proposes, and the alternative trial strategies and maneuvers he envisions, are on the whole not unreasonable. But his latest con will not succeed. Unlike his victims, the Court is not taken in by his glib assertions that do not withstand scrutiny and are for the most part readily undermined by the trial record. The only question before the Court under Strickland prong one is whether the performance of counsel, informed by strategic choices made at the time and in light of the totality of the circumstances, met an objective standard of reasonableness. The Court answers that straightforward question in the affirmative on all seventeen of Barry's trial-based claims.

### 1.   Counsel's Opening Statement

Barry's challenges the following portion of counsel's opening statement:

"Your house will always go up in value." Do you folks remember that one? A lot
of people bought into that for a long time. Families bought places they couldn't
afford, banks gave anyone who asked a mortgage, and the evidence in this trial
will show that Philip Barry bought into that same myth: that you can't lose in real
estate. And when that bottom burst, when that bottom fell out and the bubble
burst, everyone who made that bet lost money. Phil Barry lost big - His firm
collapsed. (Trial Tr. Nov. 9, 2010 at 45).

Barry devotes ten pages of interpretive analysis of this passage in an effort to establish

that it was "knowingly . . . false" and that it "likely invoked antipathy and disdain" on the part of

the jury.

The allegations do not establish deficient performance. The challenged remarks simply

offer jurors a non-criminal and essentially irrelevant explanation for the fall of Barry's financial

operation (the portfolio known as the Leverage Group, into which investors funds were pooled)

by attributing its losses to the wider real estate decline rather than inherent Ponzi collapse,

certainly a "sound trial strategy." Strickland, 466 U.S. at 689. It is also reckless of Barry to

accuse counsel of "knowingly" delivering false remarks. Mr. Weil states in his declaration that

he believed that some of the losses Barry suffered were due to the real estate "bubble."[5] Weil

Decl. at ¶4.

### 2. Theory of Innocence

(a) *"Discretion."* Barry claims that counsel "failed to develop and present a theory of

innocence." He asserts:

The government's case was substantially based upon the allegation that
investments were made without telling the investors what they were, or that were
different from what some investors were told they would be. The investments
were not managed separately for each individual investor, but were pooled into a
portfolio called the Leverage Group. If in fact Barry had wide discretion to select
and change investments and strategies for the group, as he asserted to counsel,

---

[5] In any event, for reasons independent of the overall strength of the government's case, the
possibility of prejudice is foreclosed by the brevity of the remark and the fact that the Court
instructed the jury that the arguments of counsel are not evidence.

and if such discretion (or a reasonable doubt as to the lack thereof) had been demonstrated to the jury, then acquittal would have almost certainly have been the outcome. Clearly, the existence of discretion should have been the dominant theory of innocence.

First, because it is simply a quarrel with a matter of trial strategy, the claim does not establish deficient performance under Strickland. Counsel Lisa Hoyes states in her declaration that co-counsel Michael Weil and she together determined, after "dozens of hours," that the most cogent theory of defense was that Barry, with no intent to defraud, invested his clients' funds in land that he genuinely believed would cover the return he promised, and that "hundreds of hours" were devoted to the preparation and presentation of this theory. Hoyes Decl. at ¶6.

Second, in any event, the record makes clear that counsel *did* place the discretion-theory before the jury. See Trial Tr. Nov. 17, 2010 at 1104-06 (in summation, counsel notes that one witness "said point blank that Mr. Barry had discretion to invest money as he saw fit," and argues, inter alia, as follows: (i) "I submit that [Barry] was vested with discretion to invest the money,"; (ii) "The investors . . . gave him discretion to handle the money"; (iii) "I say without a written contract, without an agreement, there is doubt about what was agreed to and how much discretion Mr. Barry had"; and (iv) "I submit that [it] didn't matter to [the investors] if it was real estate options or anything else.").[6]

To the extent's Barry's claim is that counsel should have pressed the theory more vigorously—he complains that there were "hundreds" of other investors "who would have testified that Barry had full discretion over investments" but whom counsel did not call—it is likewise meritless. The government makes the astute point that counsel's options were severely limited by Barry himself, who admitted in his pre-indictment meetings with the government that

---

[6] Further, victim Manuel Tutunjian did answer "yes" when asked, on cross, whether he "basically gave Mr. Barry discretion to invest the money that [he] invested with him." Trial Tr. Nov. 10, 2010 at 478.

8

he purposefully hid from most of his investors the fact that he was using their money to buy real estate because disclosing that fact would no doubt have triggered a "run on the bank." Had counsel pressed the discretion theory more vigorously, the government could and no doubt would have undermined that position by introducing Barry's contradictory proffer statements.

(b) *"Liquidity."* Barry further complains that counsel failed to advance a theory of innocence based on liquidity. He asserts:

> Another component of the government's allegations was that of misrepresentation of liquidity of investments. They supported this assertion by eliciting non-expert testimony that real estate is not liquid. Liquidity is however a relative term. Investor witnesses testified that one of the desired aspects of their investments was the ability to withdraw cash from their accounts within a reasonable time when needed, i.e. the liquidity of their portion of the Leverage Group—not the underlying investments. The subtle distinction is critical. A theory of innocence of misrepresentation of liquidity was thus readily available to defense counsel, yet they failed to use it. . . .

Barry also complains that counsel should have called as trial witnesses "[c]ountless former and partially liquidated investors" who "would have attested to having been able to promptly withdraw from their accounts."

The assertions do not establish <u>Strickland</u> deficiency. As noted, counsel *had* a trial strategy, so Barry's hindsight disagreement with counsel's choice in this regard is not actionable. He also fails to name any of the "countless" liquidated investors he claims counsel should have called.

Further, it is far from axiomatic that proof or zealous argument on the subject of liquidity would have been exculpatory, since a signature feature of a Ponzi scheme is the illusion of liquidity accomplished by the use of later investors' moneys to fund returns to earlier investors. The record reflects that that counsel did introduce the essence of Barry's "liquidity" theory during his opening statement but wisely did not dwell on it: "You heard [the prosecutor] call it a

'classic Ponzi scheme' maybe 15, 20 times. We all know how bad that sounds. But obviously, we all know when you go into the bank, when you make a deposit, the next guy making a withdrawal may take out the very same bills you deposit. So, you have to make a distinction whether he's just doing that; whether he's just using his cash and liquidity that way or whether that's his whole business model. It's an important distinction." Trial Tr. Nov. 9, 2010 at 48.

In sum, the manner in which counsel handled the concept of liquidity was sound, reasonable and prudent.

### 3. *Mens Rea* Defense

Barry states that "passing mention was made of [his] lack of self-aggrandizement as contrasted with the typical Ponzi operator or other fraudsters," but complains that "counsel failed to coherently assemble these observations into a lack of criminal intent (*mens rea*) defense."

The claim does not establish deficient performance under Strickland and hardly warrants discussion.

First, Barry's so-called "humble life style" was featured prominently in counsel's opening and summation. Second, whether Barry realized any gain from the scheme was not an element of the offense. Third, as evident by the government's reply summation, the same facts could well have undermined a claim of innocence. For example, the government argued that certain victims were "attracted to someone like Philip Barry, who doesn't buy the Mercedes...who is approachable." The government likewise argued: "It is not necessary that the government proved that the defendant actually realized any gain from this scheme. How could he? How can you [ ] in a Ponzi scheme? One day it all collapses. It's a sham." Trial Tr. Nov. 17, 2010 at 1111-13. Thus, as the government observes, "although counsel was wise to assert a 'lack of self-aggrandizement' defense, counsel was even smarter not to dwell on it." Gov. Mem.

at 12.

**4. Lack of Defense Witnesses**.

Barry claims that his attorneys' decision not to call any defense witnesses is "inexplicable." His motion describes several categories of possible witnesses. The first two relate to the discretion- and liquidity-based defense theories already discussed in claim two, above: *i.e.*, the alleged "hundreds" of investor-clients who would have testified that Barry had discretion to invest their money as he saw fit, and the "[w]itnesses involved in the financing and selling of the Leverage Group's real property holdings" who "could have been used to counter the government's claim that Barry misrepresented liquidity to prospective clients." Counsel's elections to present the discretion theory with restraint and to forego the liquidity theory have already been discussed in the context of claim two above. For those same reasons, counsel's decision not to call witnesses on these subjects does not trigger deficiency or prejudice concerns under Strickland.

Additionally, declarations from trial counsel, which the Court credits, establish that counsel worked hard to explore Barry's desire to present discretion and liquidity witnesses. Lisa Hoyes attests that "[c]ounsel contacted or attempted to contact every witness suggested by Mr. Barry either in person or by telephone" and that "[c]ounsel additionally interviewed numerous other potential witnesses about their dealing with Mr. Barry." Hoyes Decl. at ¶7. Michael Weil likewise attests that "at no point did Mr. Barry propose a specific fact witness that we did not contact or attempt to contact." Weil Decl. at ¶6. Ms. Hoyes further explains that, "[o]f the witnesses we spoke to, several parroted the allegations in the indictment, but believed that Mr. Barry was a good guy who didn't mean them harm," and that "[t]here were two people . . . who understood that Mr. Barry had invested their money in an upstate New York land venture."

Hoyes Decl. at ¶8. Finally, Ms. Hoyes advises that "[c]ounsel spent hours considering the admissibility and strategic desirability of calling a few investors who were a) satisfied or b) did not allege wrongdoing" and "made a tactical decision not to call any of the few potential defense witnesses [they] identified." Id. at ¶9. Barry's claims relating to liquidity and discretion witnesses thus fails to establish deficiency under Strickland. See, e.g., United States v. Eyman, 313 F.3d 741, 743 (2d Cir. 2002) ("A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel.").

Third in Barry's list of uncalled categories of witnesses is an "expert witness in retail banking . . . to refute" the government's evidence that many of the checks Barry wrote to his investor-clients later bounced; Barry says that evidence is based on flawed methodology.

The claim is frivolous.

Barry's proposed counter-methodology smacks of horseplay befitting the con-artistry of his crimes and the tenor of much of his section 2255 motion. Victims testified that their checks from Barry bounced, see, e.g., Trial Tr., Nov. 9, 2010 at 166, and the government had available to use as rebuttal Barry's proffer admission that he "frequently issued checks to investors knowing that there was a high likelihood that they would bounce." (DE #37 at 8).

In any event, the controlling black letter principle—that the strategic decision not to call a witness is not ineffectiveness—is not diluted where the witness in question is an expert, and both members of Barry's trial team attest that the decision not to call an expert was of a strategic nature. See Hoyes Decl. at ¶11 ("With respect to expert witnesses, we determined that the only type of expert witness who could have furthered our theory of defense was one who could opine on the value of the land that Mr. Barry owned. To that end, we attempted to call Bill Rieber, a real estate agent familiar with Mr. Barry's landholdings. We were precluded from presenting Mr.

Reiber's testimony at trial."); Weil Decl. at ¶ 6 ("Based on the trial testimony and proffer statements, we determined that there was no expert whose testimony would have been admissible and helpful after the Court's ruling [that] we could not call Mr. Rieber.").[7]

Finally, Barry argues that counsel should have called a bankruptcy attorney, trustee, or other bankruptcy expert "to explain and give perspective" to the audio recordings of bankruptcy creditor meetings played at trial. He asserts that "[s]uch explanations would have balanced the prosecution's intimation of sinister motives to Barry's personal Chapter 11 bankruptcy filing," and that "[a]ctual witnesses from the bankruptcy case such as Alan Nisselson, the court-appointed trustee, or Jacqueline Frome, assistant to the United States Trustee, would have testified that contrary to the impression given by the government's selective playing of out-of-context portions of creditors meetings audio tapes, they found Barry to be a very cooperative debtor." Barry further asserts that "in the absence of any bankruptcy witnesses, the jury was left with the misconception that Barry was using the bankruptcy court for nefarious purposes, thereby prejudicing him at trial . . . and . . . at sentencing."

Barry's creative suggestions do not establish that counsel's handling of the subjects in question was deficient in any respect. Further, the government reports that it has been in contact with Mr. Nisselson and that he represents that if he had been called, he would not have testified as Barry describes.

### 5. Trial Counsel's Qualifications

Barry's complaint that his attorneys were not qualified to represent him because they

---

[7] Barry's alternative claim that counsel was ineffective for not calling a witness from one of the institutions where he banked to address the subject of bounced checks fails for the same reason. Likewise, Barry's claim that counsel was ineffective for declining to cross-examine M&T Bank Manager James Constanino is frivolous. The decision not to cross-examine a witness is a matter of strategy.

were not specialists in securities law is not a basis for federal habeas relief. The Sixth

Amendment guarantees not a specialist but basic "competence." Oyague v. Artuz, 393 F.3d 99,

107 (2d Cir. 2004). Barry received such competence and more: both members of his trial team

are experienced federal criminal defense lawyers who, in total, have tried approximately thirty

cases to verdict.[8]

### 6. "Speculation" by Robert Lundberg

Barry asserts that his trial lawyers were ineffective because they did not adequately

object to certain testimony offered by Lundberg as speculative. The assertion is baseless.

Counsel *did* object to Lundberg's testimony for precisely this reason. See Trial Tr. Nov. 15,

2010 at 874. He also points to the fact that, during a sidebar, the Court remarked upon the need

for the government to lay a better foundation for some of the views Lundberg was expressing,

but these remarks do not establish constitutionally deficient conduct by his trial counsel:

immediately following the sidebar, the government elicited the necessary foundation. Id. at 896

(referring back to the challenged testimony, the government asked Mr. Lundberg, "How do you

know that? Why do you say that?"). The remaining assertions in this sixth claim—such as his

attack on counsel for failing to object to one question as leading, and to another as "sly"—are

frivolous.


### 7. Lundberg's Prior Consistent Statements

Barry complains that, after the Court acknowledged in a sidebar that it should have

sustained earlier objections to certain testimony of Lundberg's as hearsay, counsel should have

---

[8] Barry further complains that, because of their lack of expertise in securities law, his lawyers did not move to dismiss the securities count of the indictment, did not challenge the government's use of the term "Ponzi," and failed to object to the loss figures at sentencing. These allegations reappear in later claims (numbers 17, 12, and 22, respectively) addressed *infra*.

done more, such as move to strike the statements, or request that the Court specify for the jury which statements were hearsay.[9]

Assuming this claim were cognizable,[10] the Court readily finds no deficient performance. Because the sidebar did not immediately follow the testimony at issue, counsel did not act unreasonably by electing not to call the jury's attention back to it.

### 8. Lundberg's Credibility

Barry's abuse of the Sixth Amendment guarantee is at its nadir with this claim, which alleges that counsel was ineffective for "going easy" on Lundberg, and for failing to elicit from Lundberg an express disavowal of testimony that, as Barry reads the transcript, Lundberg later admitted he had made without full knowledge. Specifically, Barry asserts, "The problem is that the answers elicited on cross examination were not utilized to expressly discredit the speculative prejudicial answers that the witness had given on direct examination," and that "[c]ompetent counsel would have made certain that the nexus between the original answer and the answer which discredited it was clear in the jurors' minds."

The claim does not establish deficient performance under Strickland.

### 9. Barry's Prior Sworn Bankruptcy Testimony

Barry complains that counsel was ineffective for failing to make a host of evidentiary objections to the government's use of excerpts of audio tapes of creditor meetings from Barry's

_____

[9] The government asked Lundberg whether, when he met with government agents, he told them that he had previously committed crimes. The Court initially overruled the hearsay objections. Trial Tr. Nov. 15, 2010 at 851. Twenty-three pages later in the trial transcript the Court remarked, in sidebar, that he should have sustained the objections. Id. at 874.

[10] As noted in note 3 *supra* the underlying claim—that Barry Lundberg's prior consistent statements were improperly admitted—was raised on Barry's direct appeal. Barry, 502 Fed. Appx. at 86-87. As already noted, the Circuit held that because of the "overwhelming evidence of Barry's guilt . . . any evidentiary error was harmless." Id. at 87. Thus, the claim based on the admission of Lundberg's prior consistent statements is barred from review on Section 2255.

bankruptcy case. He asserts, *inter alia,* that counsel should not have agreed to the playing of the tapes, should have sought to introduce other portions under the rule of completeness (Rule of Evidence 106), should have objected to the audio as "muddled," and should have further objected to such inconsequential matters as the government's reference to the proceedings as "hearings" and to the questioners as "bankruptcy attorneys" or "examiners."

No deficiency is established. Barry's recorded statements were of course admissible so there was no basis for counsel to oppose their use, and the rest of the allegations are frivolous.

### 10. Peninsula Club Testimony

Barry's tenth claim is another hindsight perfectionist demand hardly worthy of discussion, except to highlight that it illustrates how the availability of "ineffectiveness" claims on 2255 leads to abuse of the writ.

Victim Philip Bray testified that Barry once told him that he (Barry) was a member of "the Peninsula Club" at a New York hotel, The Peninsula. The government called the hotel's Director of Revenue Management Alison Shewell, who testified that the hotel once had such a club but that Barry was not a member. Defense counsel's cross-examination of Shewell exposed that the hotel actually had two clubs, allowing for the suggestion that Barry had told Bray the truth. The day after the defense rested, Barry presented his lawyers with his "Peninsula Hotel Health Club photo ID membership card" and now asserts they were ineffective for failing to seek to introduce the card by motion to re-open the defense case or by stipulation.

The pettiness of the claim speaks for itself. The Peninsula Club was a minor moment in the trial (it was not mentioned by either side in summation) and Barry's membership in a club was not one of the material misrepresentations he was charged with making to his victims.

### 11. Testimony Regarding Insufficient Funds Fees

Wendy Spaulding, the government's financial analyst who reviewed Barry's banking records, testified that, according to the records, between February 2005 and July 2008, Barry wrote a total of 1,623 bounced checks to his victims. Spaulding was asked to provide the "total amount of fees associated with the bounced checks," and she stated, $46,191. She described the fees as "insufficient funds fees" that a bank "charges when there's an overdraft situation in the bank account and checks are returned by the bank because there is not enough money in the account to pay the checks." In his petition, Barry argues that Spaulding "was drawing a false equivalency between the imposition of an insufficient funds fee, and the checks being returned by the bank" because "[t]ypically, banks pay checks against uncollected or even insufficient funds for their long established business customers." He asserts that "the vast majority of the 1,623 alleged bounced checks were paid by the bank against uncollected funds, or paid and covered by a deposit or transfer into the account that day."

Barry once again frames a damaging feature of the prosecution's case against him as somehow an indication that counsel was deficient: he asserts that counsel either should have objected to Spaulding's testimony or used banking statements included in the discovery materials to establish, through cross examination, that certain of the checks alleged to have bounced were in fact paid. Barry's papers describe a conversation with counsel on the subject in which his proposed course was rejected, with counsel advising Barry, in substance, "No, Phil, they bounced"; neither of the counsel declarations addresses the matter.

Regardless, counsel's decision not to call further attention to the incriminating facts by pressing the matter as Barry urges is sound strategy by any measure: as already noted, there was victim fact testimony that checks from Barry bounced, and there loomed the risk of government

rebuttal with Barry's proffer admission that he frequently wrote checks to his clients knowing they would likely bounce. Accordingly, Barry has not established deficient performance with respect to the bounced-checks testimony.

### 12. Use of the Term "Ponzi"

Barry complains that counsel did not do enough to prevent the government's use of the term "Ponzi," which he claims is inflammatory and caused him prejudice because of his trial's temporal proximity to the Bernard Madoff affair.

Assuming the claim is cognizable,[11] it does not establish deficient performance. Ms. Hoyes states in her declaration that she and co-counsel determined that there was no legal basis to exclude the use of the term "Ponzi scheme" in the presentation of the government's evidence, and so they did not move *in limine*. Nevertheless, before the start of jury selection counsel did object, twice, to the use of the term "Ponzi" on the ground that the word was not in the indictment and was inflammatory. Once the Court determined that the term was appropriate, however—as the word accurately described the indicted activity and aided the jurors' understanding—it would have been futile for counsel to have pressed the point further.

### 13. Cash Withdrawals and Checks Made Payable to Cash

Barry here seeks to revisit the portion of the trial during which a government financial analyst testified that Barry wrote checks from the Leverage account payable to cash and that he made substantial ATM cash withdrawals. Barry argues that "[t]his testimony created a substantial risk that the jury would interpret this amount to have been investor funds that Barry withdrew for his personal use," and that counsel should have done more to "dispel" this

---

[11] As stated in note 3, *supra*, the underlying claim—that the term "Ponzi" was inflammatory and unduly prejudicial—was raised in Barry's pro se supplemental appellate brief and rejected by the Second Circuit. See Barry, 502 Fed. Appx. at 88 ("We have considered all of Barry's remaining arguments and find them to be without merit").

"notion." Barry specifically asserts that records available to counsel could have been used to show a correlation between some of the cash withdrawals or payable-to-cash check and the funding of investor withdrawals.

The decision not to call undue attention to the testimony concerning cash was sound strategy, particularly because the government already took the position that Barry used most of the cash he got from investors to make payments to other investors (a key feature of a Ponzi scheme) and that he did not spend lavishly on himself.

### 14. Allegedly "Pointless" and "Inadequate" Cross-Examinations

Barry cites the testimony of three government witnesses as occasions on which he feels counsel could have conducted a lengthier or different cross-examination: Linda Seimars of the Securities Investors Protection Corporation (SIPC), who testified principally that neither Barry nor his entities was registered with SIPC; FBI Special Agent Theodore Cacioppi, who testified about certain bounced checks; and victim Raymond Barglow, who testified that he gave approximately $150,000 to Barry in 2008, asked for the money back several months later but did not receive it.

The Court finds deficiency in the three challenged cross-examinations, notwithstanding Barry's insistence to the contrary, which reflects the common lay misperception that longer is better on cross.

### 15. Counsel's Closing Argument

Barry claims that his attorney's summation, which spanned 29 transcript pages, was too short, and that it omitted certain favorable cross-examination points. Decisions as to the content of a closing argument are quintessentially strategic and tactical, and the Court finds that in this case the summation reflected a sound strategy that satisfies the objective standard of

reasonableness.

### 16. The Government's Reference in its Rebuttal Summation to Excluded Defense Evidence

Barry complains that his attorneys should have objected or requested a sidebar during the government's rebuttal summation when the government stated: "There is no evidence in the record whatsoever – other than Philip Barry's self-serving statements—that this land he bought upstate is worth anything approaching what he owes his clients." Trial Tr. Nov. 17, 2010 at 1120. Barry describes this remark as "breathtaking in its audacity and impropriety" because the defense had sought to introduce evidence on the subject in the form of expert testimony from real estate agent Bill Rieber but the Court ruled it inadmissible.

The claim does not establish deficient performance. Whether Barry's real estate transactions might net a profit that he could pass on to his investors was not relevant to—and thus would not excuse—the falsity of the representations Barry made to his investors. Counsel therefore was prudent in not objecting.

### 17. A Motion to Dismiss the Securities Count

Claim number seventeen is based on the following colloquy, which occurred at the start of the charging conference:

> COURT: I almost asked you earlier in the day this question: is the Government going to insist that we charge the jury on Count One? Or, to put it another way, do we have a security here?
>
> GOVERNMENT: We actually do your Honor. It's an investment contract under the *Howey* test.[12]
>
> COURT: I don't disagree with you now that I've been educated a bit, but you

---

[12] The reference is to SEC v. Howey, Co, 328 U.S. 293 (1946), which outlined a three-part test for determining when investment contracts are securities.

can't help but wonder, you can't help but understand why I would ask that question given what I've been hearing. That's the law side. On the practical side, there's a fair question as to whether we need to throw the securities conspiracy at them. I'll leave you with that thought to ponder over the weekend.

Barry claims counsel was ineffective for failing to move under Rule 29 to dismiss the the securities count.

Even if cognizable independently under the Sixth Amendment,[13] the claim is meritless. Barry overlooks the key component of the Court's remarks—"I don't disagree with you now that I've been educated a bit . . . [t]hat's the law side"—which are dispositive of the deficiency and prejudice inquiries under Strickland. Simply put, regardless of the Court's practical concerns, it would not have had a legal basis for dismissing Count One. See generally S.E.C. v. SG Ltd., 265 F.3d 42, 51 (1st Cir. 2001) (Ponzi scheme typically involves a "security" within the meaning of federal securities law). Thus, counsel's election not to move to dismiss was entirely appropriate.

## PART II: THE SENTENCING CLAIMS

The six branches of Barry's claim alleging ineffectiveness during the sentencing phase of his case do not require extensive discussion.

### 18. Lack of Bail Application

Barry complains that counsel should have scheduled a bail hearing following the verdict. This claim does not establish deficient performance. Ms. Hoyes states in her declaration that "numerous efforts" were made "to assemble a bail package after Mr. Barry was remanded" but that "[t]here were no appropriate sureties willing to sign a bond after the verdict." Hoyes Decl. at ¶15. Further, as the Court to whom the bail application would have been made, this Court can

---

[13] As the Court observed in note 3, the underlying legal claim—that there was a lawful basis to dismiss the securities count—could and should have been raised on direct appeal. Because Barry did not do so, he is barred from raising it here. Frady, 456 U.S. at 164-65; Zhang, 506 F.3d at 166. And, as noted with respect to other claims, the availability on 2255 of Sixth Amendment packaging does not revive a barred appellate claim.

confidently say, given the overwhelming evidence of Barry's guilt, his awareness that he faced a

substantial sentence, and the apparent absence of any viable appellate issues, that the application

would have been denied. Accordingly, counsel cannot be faulted for not seeking Barry's

release.

### 19. Lack of **Fatico** Hearing

Barry claims that counsel was ineffective for failing to request a hearing to present

evidence to refute the bankruptcy fraud sentencing enhancement. Both the deficiency and

prejudice questions are foreclosed by the sentencing portion of the Second Circuit's decision on

Barry's appeal.[14] In rejecting Barry's sentencing claims, the Circuit could "identify no

procedural defect in the district court's factfinding," Barry, 502 Fed. Appx. at 87, and concluded:

"Considering the serious nature of Barry's crime, the length of time over which he perpetrated it,

and its impact on so many victims, we cannot conclude that a 20-year sentence was outside the

broad range of permissible decisions available to the sentencing court." Id.

More specifically, the Circuit rejected Barry's claim "that the evidence does not support a

finding that his actions in the bankruptcy proceeding evidenced intent to defraud." Id. The

Circuit found that "[t]he record . . . reflects that Barry omitted basic information concerning his

assets and creditors in his initial bankruptcy petition" and "he repeatedly sought to reduce his

culpability in the bankruptcy proceedings by misrepresenting amounts of loss by over $10

million and by refusing to answer questions directly." Id. at 87-88. Further, the Circuit

concluded that "[t]hese omissions and misrepresentations were so blatant as easily to support a

preponderance finding that Barry acted with the deceit necessary for a § 2B1.1(b)(8)(B)

enhancement." Id. at 88.

---

[14] The fact that Barry received a sentence well below the Guideline advisory range further
demonstrates the absence of prejudice

The hearing Barry contemplates would have been futile and no doubt very imprudent.

**20.  Bankruptcy Court Record**

Barry complains that counsel was ineffective for appearing at his sentencing without the full publicly available record of his bankruptcy proceeding and for not utilizing parts of it that he asserts could have helped refute the bankruptcy fraud enhancement.

The Circuit's findings on the bankruptcy fraud enhancement again control.  The claim therefore fails to establish deficiency or prejudice under Strickland for the reasons discussed with respect to the foregoing claim.

**21.    Guideline Citation Error**

Barry claims that the bankruptcy fraud enhancement was incorrectly assessed because counsel allegedly failed to cite the applicable Guidelines requirements for its imposition.  The claim is rejected as frivolous.

**22.    Validity of the Victim Loss Affidavits**

Barry claims that counsel failed to check the validity of the loss affidavits by cross-checking the asserted figures against other records, resulting in substantial error in the calculation of the loss figure.

The claim is meritless in light of the Second Circuit's decision on the underlying issues. Reviewing for plain error, the Circuit rejected Barry's appellate challenge to loss amount and number of victims, finding that "the record clearly supports application of the challenged enhancements because Barry cannot show any error, let alone plain error." Barry, 502 Fed. Appx. at 88.  The Circuit found that "[t]he factual findings of the PSR, which the district court adopted, presented detailed information culled from victims' loss affidavits showing a total loss of $24,731,184 to 333 separate investor victims," and that "[t]his was sufficient to support a 22-

level loss enhancement pursuant to U.S.S.G. § 2B1(b)(1)(l) (adding 22 levels for loss exceeding $20 million) and a 6-level victim enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(C) (adding 6 levels for offense involving more than 250 victims)." Id.

As regards the efforts of counsel, the Court notes that in his declaration, Mr. Weil states that Ms. Hoyes and he "had lengthy discussion with Mr. Barry about the loss amount" but that "[t]here was no theory available that would bring the loss below $20 million, the [applicable] guideline threshold." Weil Dec. at ¶8.

Additionally, as noted, the fact that Barry received a sentence substantially below the Guideline advisory range further demonstrates the absence of prejudice.

### 23.     Reasonable Foreseeability of Victims' Pecuniary Harm

Barry asserts that counsel was deficient for failing to argue that the harm suffered by his victims was not "reasonably foreseeable" within the meaning of U.S.S.G. §2B1.1  The claim is frivolous:  counsel was prudent, not deficient, for declining to make an argument so belied by the trial evidence.

### CONCLUSION

For the reasons discussed, Philip Barry's application for relief under 28 U.S.C. § 2255 is denied.  Because Barry has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.

SO ORDERED.

Dated: Brooklyn, New York
      June 16, 2015                        /s/ Judge Raymond J. Dearie

                                  RAYMOND J. DEARIE
                                  United States District Judge